**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| DENISE TURNER,<br><br>Plaintiff,<br><br>v.<br><br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security<br><br>Defendant. | ) | CASE NO. 1:13CV1916<br><br>JUDGE DONALD C. NUGENT<br><br>MAGISTRATE JUDGE GREG WHITE<br><br><br>**REPORT & RECOMMENDATION** |

Plaintiff Denise Turner ("Turner") challenges the final decision of the Acting Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381 *et seq*. This matter is before the Court pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be VACATED and the case REMANDED for further proceedings.

## I. Procedural History

On July 19, 2010, Turner filed an application for SSI alleging a disability onset date of March 1, 2010 and claiming she was disabled due to fibromyalgia; asthma; and, chronic obstructive pulmonary disorder ("COPD"). (Tr. 100.) Her application was denied both initially and upon reconsideration. (Tr. 130-132; 135-137.)

On March 7, 2012, an Administrative Law Judge ("ALJ") held a hearing during which Turner, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 50- 98.)

During the hearing, the ALJ granted Turner thirty (30) days to submit additional evidence. (Tr. 53-54.) After receiving two extensions of time, Turner submitted, on April 24, 2012, a Physical Residual Functional Capacity ("RFC") report from her treating physician, Brenda Perryman, M.D. (Tr. 19, 280.) On April 27, 2012, the ALJ found Turner was able to perform a significant number of jobs in the national economy and, therefore, was not disabled. (Tr. 34-44.) Turner thereafter requested the ALJ review her decision because it failed to address Dr. Perryman's opinion. (Tr. 280-281.) The ALJ issued an amended decision on June 22, 2012, in which she again found Turner was not disabled. (Tr. 19-30.) The ALJ's decision became final when the Appeals Council denied further review. (Tr. 8-10.)

## II. Evidence

***Personal and Vocational Evidence***

Age forty-two (42) at the time of her administrative hearing, Turner is a "younger" person under social security regulations. *See* 20 C.F.R. § 416.963 (c). (Tr. 55-56.) She has a high school education and past relevant work as a waitress, short-order cook, caregiver, packer, construction worker, and cashier. (Tr. 28-29, 57, 83-84.)

***Relevant Medical Evidence***[1]

Turner began treatment with Brenda Perryman, M.D. in August 2008 with complaints of bilateral hand pain and cramping. (Tr. 376.) Dr. Perryman's treatment notes indicate Turner's "rt thumb is starting to curve out." *Id*. Turner returned to Dr. Perryman in September and October 2008, reporting that her hands were "really bad" and she was unable to carry trays at her waitressing job because her fingers would not straighten out. (Tr. 374-375.) Dr. Perryman referred her for orthopedic, neurological, and psychological evaluation. (Tr. 374.)

On November 7, 2008, Turner presented to neurologist Adam Quick, M.D., for consultation regarding her "bilateral hand pain and her diffuse pain all over her body." (Tr. 577.) She reported "the entire hand will go numb and sometimes there is radiation up into the

[1] As it is not dispositive to the outcome, this Report & Recommendation will not discuss the medical evidence regarding Turner's COPD and abdominal issues.

arm and sometimes there will be pain shooting up the arm to the level of the neck as well." *Id*. Turner also indicated tingling and numbness in her legs, especially at night. *Id.* She stated "she has pain all over her body and essentially anywhere you touch her makes her jump with pain." *Id*. Dr. Quick thought Turner's pain was most likely due to fibromyalgia, and believed her leg tingling/numbness was due to restless leg syndrome. (Tr. 577-578.) He referred her to rheumatology for an evaluation and ordered an MRI of her cervical spine; EMG and nerve conduction studies of her bilateral upper extremities; and, blood work. (Tr. 578-579.)

The MRI demonstrated a mild disc bulge at C5-C6 without significant spinal or foraminal stenosis although there was some left lateral recess encroachment with mild encroachment on the nerve on that side. (Tr. 575.) The lab work was normal, with the exception of a low vitamin B12 level. *Id*. Turner returned to Dr. Perryman for B12 injections in November 2008, December 2008, and January 2009. (Tr. 370-372.)

Meanwhile, Turner presented to rheumatology fellow Yinqxue Zhang, M.D., and rheumatologist Madhu Mehta, M.D., on January 9, 2009. (Tr. 383-384.) She complained of "pain from head to toes," as well as numbness and tingling of her arms, hands, and legs. (Tr. 383.) On examination, Dr. Zhang noted full range of motion in all joints; no synovitis; and, intact muscle strength in the upper and lower extremities 5/5. (Tr. 384.) He did note, however, that Turner had "excessive tender points, 18/18 in fibromyalgia distribution." *Id*. Dr. Zhang diagnosed fibromyalgia; prescribed Neurontin; and, encouraged Turner to exercise and lose weight. *Id*.

Turner returned to Dr. Quick in March 2009. (Tr. 585-586.) He noted that "her story continues to evolve to some degree," noting she now reported leg numbness/tingling throughout the entire day rather than just at night. (Tr. 585.) Dr. Quick indicated Turner's EMG and nerve conduction studies performed in February 2009 were "completely normal." (Tr. 586.) He increased her Neurontin and recommended an MRI of her lower spine. *Id.*

Turner also presented to Dr. Zhang in March 2009. (Tr. 386-387.) She continued to report "pain from head to toe," and numbness and tingling of her arms and legs. (Tr. 386.) She also complained of low back pain. *Id*. A musculoskeletal exam showed no synovitis; full range

of motion; and, excessive tender points (18/18) consistent with fibromyalgia. *Id*. Dr. Zhang increased Turner's Neurontin and again recommended exercise. (Tr. 386-387.)

Turner returned to Dr. Perryman in December 2009, complaining that she "wants something for her fibromyalgia" and indicating she could no longer afford to continue seeing Dr. Zhang. (Tr. 368.) She presented to Dr. Perryman again in February 2010, at which time she stated that her "back and hands still hurting so bad– pt wishes she could just quit working- hands hurt so bad she cannot lift tray with three drinks on it." (Tr. 365.) Dr. Perryman prescribed Lyrica and encouraged Turner to eat balanced meals and exercise. *Id*.

Turner returned to Dr. Zhang in March 2010. (Tr. 390-391.) She complained of chronic back pain; and, numbness and tingling in her lower back and legs. (Tr. 390.) On examination, Dr. Zhang again noted tender points "consistent with fibromyalgia." *Id*. He ordered an x-ray of her lumbar spine, which showed mild facet arthropathy and minimal degenerative changes at the bilateral sacroiliac joints. (Tr. 390-391.) He increased her Gabapentin; discontinued her Lyrica; and, recommended aquatic and electronic stimulation therapy. *Id*.

Turner presented to Dr. Mehta on July 16, 2010. (Tr. 392-393.) Turner reported she was unable to tolerate Gabapentin, Lyrica, Vicodin or Percocet, due to nausea and vomiting. (Tr. 392.) She also indicated physical therapy did not help and she "felt worse post session." *Id*. Dr. Mehta observed that Turner's "musculoskeletal examination is actually quite unremarkable with no synovitis in any of the joints and significant tenderness over the lumbosacral spine." *Id*. Although Dr. Mehta indicated Turner's fibromyalgia was "not fully controlled," she did not recommend a follow-up appointment "as there is not really a whole lot more I can offer her." *Id*.

Meanwhile, Dr. Perryman referred Turner to Robert Crowell, M.D., for evaluation of her lower back pain. (Tr. 363-364.) Turner presented to Dr. Crowell on April 19, 2010, complaining of primarily local lower lumbar pain "that has been present for a year in some form, and severe for the last 2 months." (Tr. 562.) Her physical exam showed diffuse lower lumbar tenderness, maximal at the L5/S1 level; and, mild diffuse decrease in lumbar range of motion in all planes, "pain worst with flexion." *Id*. Dr. Crowell noted that lumbar and cervical x-rays from April 2010 showed "no worrisome abnormalities." *Id*. He prescribed a "more formal

course" of physical therapy and "encouraged [Turner] to give this a bit more time." *Id.* The record indicates Turner underwent five physical therapy sessions in May 2010, and then indicated she wanted to "stop therapy at this time." (Tr. 405, 451-454, 457.)

Dr. Crowell subsequently ordered an MRI of Turner's lumbar spine. (Tr. 833-834.) This MRI was conducted on June 23, 2010 and showed "fairly widespread minor age-appropriate degenerative changes without significant herniation, severe dessication, or loss of height anywhere." (Tr. 573, 833.) On June 28, 2010, Dr. Crowell reviewed Turner's MRI and recommended a "nonoperative management approach directed toward her mechanical low back pain and fibromyalgia." (Tr. 573.)

Dr. Perryman subsequently referred Turner to Halina Pritula, M.D. (Tr. 732-733.) Turner first presented to Dr. Pritula on January 31, 2011 with complaints of diffuse muscle aches, paresthesias in her upper and lower extremities, and significant pain in her right thigh, lateral aspect. (Tr. 732.) She indicated experiencing symptoms for the last three years and described her pain as "aching and stabbing in nature." *Id.* Turner also reported she was unable to tolerate a number of medications due to nausea and vomiting. *Id.* On examination, Dr. Pritula observed normal strength at 5/5 in her upper and lower extremities; normal tone and bulk; normal gait; and, normal coordination. *Id*. She did observe decreased sensation over the right lateral femoral cutaneous nerve distribution and "tenderness over eighteen points, tenderness along the spine which is supportive for a diagnosis of fibromyalgia." *Id*. Dr. Pritula diagnosed fibromyalgia and right meralgia paresthetica. *Id*. She prescribed Cymbalta and Relafen; and, ordered a CT of Turner's abdomen. (Tr. 732-733.) Dr. Pritula also instructed Turner not to wear tight clothes and to work on weight loss "which is the most common cause of Meralgia paresthetica." (Tr. 733.)

Turner returned to Dr. Pritula in February 2011. (Tr. 724-725.) Turner reported severe pain in her right thigh that was "stinging, stabbing, burning" and "significantly interfere[d] with performing daily routines, ambulation, and sleep." (Tr. 724.) Dr. Pritula increased her Cymbalta and referred her to Arthur Kumpf, M.D., for evaluation of her abdominal obesity which she believed might have resulted in the compression of Turner's right lateral femoral cutaneous

nerve (LFCN). (Tr. 725.) Dr. Pritula also advised Turner to work on weight loss and continue daily home exercises. *Id*.

Turner presented to Dr. Kumpf on March 9, 2011. (Tr. 775-777.) Dr. Kumpf assessed "pain in the right leg in the setting of minor back changes and non-operative management strategy, with numbness in the distribution of the LFCN." (Tr. 777.) Turner elected to proceed with chemical denervation of the LFCN through a Marcaine injection. *Id*. In a follow-up visit one week later, Turner reported the injection "did not seem to help at all." (Tr. 773.) She reported "no active pain in the legs and back, and this was unable to be illicited with spinal compression." *Id*. Dr. Kumpf found that Turner's "back and leg pain [were] of uncertain etiology." *Id*.

Turner returned to Dr. Kumpf in June 2011 complaining of continued numbness in her right anterior thigh. (Tr. 772.) She reported she had stopped all pain medications except for Aleve, "because they all made her sleepy." *Id*. Dr. Kumpf noted "some trigger points" in Turner's calves. *Id*. He concluded that surgery on her LFCN "likely would not help." *Id.*

Meanwhile, Turner presented to Dr. Pritula in May 2011, reporting no improvement of her symptoms and intolerance to all prescription pain medication. (Tr. 720-723.) Dr. Pritula observed "tenderness on palpation along spinal paravertebral muscles" and decreased sensation over the lateral aspect of Turner's right thigh. (Tr. 722.) She assessed fibromyalgia and right meralgia paresthetica and instructed Turner to follow-up with a rheumatologist. (Tr. 723.) She also advised Turner to increase ambulation, work on weight loss, and avoid wearing tight clothing. *Id*. Finally, Dr. Pritula discharged Turner as a patient on the grounds she was "not compliant with medication and stoped [sic] it, refused to have trials of other medications." *Id*.

Turner presented to Dr. Perryman in August 2011 with complaints of lower back pain; knee pain; and, tingling in her left leg. (Tr. 884.) In November 2011, Turner reported to Dr. Perryman that she "has a lot of pain if she stands and does dishes or walks very far." (Tr. 882.) The following month, Turner indicated she was "in so much pain all over she can hardly take it anymore." (Tr. 881.) She reported to Dr. Perryman that she had "knots on her back left side" and "sharp pains up and down legs when she sits." *Id*. Turner further indicated she could not go

up or down stairs or carry anything. *Id*.

The record indicates Turner underwent a course of physical therapy for her right knee pain from December 2011 through January 2012. (Tr. 908.) In February 2012, Turner underwent a tibial tubercle transfer of her right knee due to lateral subluxation patella with patellofemoral pain syndrome.[2] (Tr. 887-895.) Joseph Guth, M.D., performed the surgery, noting Turner had tolerated the procedure well and her pain was "well-controlled" upon discharge. (Tr. 888.)

On April 4, 2012, Turner presented to Dr. Perryman complaining of daily, severe pain in her arms, legs, hips and back. (Tr. 927.) She also indicated increased cramping in her hands and a resultant inability to lift objects. *Id*. Dr. Perryman assessed chronic lower back pain, fibromyalgia, and status post right knee surgery; and, referred her to a neurologist for evaluation. *Id*.

Shortly thereafter, on April 23, 2012, Dr. Perryman completed a Physical RFC Questionnaire. (Tr. 922-926.) She indicated diagnoses of fibromyalgia, COPD, hyperlipidemia, and obesity; and, rated Turner's prognosis as fair. (Tr. 922.) Dr. Perryman described Turner's symptoms as "multiple joint complaints of pain; low back pain; cramping/weakness of hands; dizziness with standing long periods." *Id*. She characterized Turner's pain "as 9.5/10 pain severity; pt states severe stabbing pains in legs but occurs everywhere especially with sitting." *Id*. Dr. Perryman also noted Turner experienced side effects from her fibromyalgia medications, including nausea, vomiting, dizziness, and drowsiness. *Id.*

Dr. Perryman concluded that Turner's experience of pain would be severe enough so as to "constantly" interfere with the attention and concentration needed to perform even simple work tasks. (Tr. 923.) She found Turner could walk zero city blocks without rest or severe pain; sit for 30 minutes at one time before needing to get up; stand for 30 minutes at one time before needing to sit down or walk around; and, would need to walk around every 30 minutes for five

---

[2] Turner indicates that, in October 2011, she underwent an unsuccessful arthroscopy and lateral retinacular release and debridemant for patello pain syndrome. (Doc. No. 21 at 5.) She does not direct this Court's attention to any medical records relating specifically to this surgery.

minutes. (Tr. 923-924.) In addition, Dr. Perryman concluded Turner (1) could sit and stand/walk for a total of less than two hours each in an eight hour work day; (2) would need a job that permitted shifting positions at will from sitting, standing or walking; and, (3) would need to take frequent unscheduled breaks of 30 minutes in duration during an eight hour workday. (Tr. 923-924.) She opined that, if Turner had a sedentary job, she would need to elevate her legs at a 90 degree angle for 50% of the workday. (Tr. 924.) Dr. Perryman further offered that Turner would need a cane or other assistive device while engaging in occasional standing/walking. *Id.* She found Turner could never lift and carry more than 10 pounds and could only rarely lift and carry less than 10 pounds. *Id*. She found Turner could never crouch/squat or climb ladders; but could frequently twist and occasionally stoop (bend) and climb stairs. (Tr. 925.) Dr. Perryman also concluded Turner could use (1) her hands to grasp, twist, or turn objects for 20% of a workday; (2) her fingers to perform fine manipulation 25% of a work day; and, (3) her arms to reach (including overhead reaching) 25% of a workday. *Id.* Finally, she found Turner's impairments would be likely to produce good days and bad days, and that she would likely be absent from work more than four days per month as a result of her impairments or treatment. *Id.*

***Hearing Testimony***

During the March 7, 2012 hearing, Turner testified to the following:

- She is married with three children, ages 14,18, and 22. She lives in an apartment with her husband and fourteen year old son. (Tr. 56-57.)

- She obtained her GED, but has had no further education or vocational training. (Tr. 57.)

- Between 1996 and 2010, she worked as a cashier, deli clerk, drive thru attendant, packer, waitress, short order cook, and caregiver. (Tr. 58-61.) She also worked on and off during this time period helping her husband lay carpet, vinyl and tile. (Tr. 61.) In these jobs, she was required to lift and carry anywhere between 15 pounds (as a packer) and 150 pounds (as a caregiver). (Tr. 58-61.) She stopped working in 2010 because it was difficult for her to handle anything due to her hand cramps, or walk up steps due to her leg pain. (Tr. 58-59.)

- She cannot work now because of pain in her hands, leg, and back. (Tr. 62, 67.) Both of her hands cramp up, making her unable to carry things or do household chores such as laundry and dishes. (Tr. 68, 75.) She drops things and has trouble counting money because it is difficult for her to separate bills. (Tr. 75, 78.) She uses the computer every now and then, but does not use the keyboard because her fingers "start to hurt and cramp." (Tr. 78.)

- She experiences stabbing pain and muscle spasms in her upper right leg. (Tr. 71-72.) The pain wakes her up in the middle of the night and makes her cry. *Id*. She also experiences loss of sensation and numbness in her legs, which causes her to fall four or five times per week. (Tr. 71-73.) Dr. Perryman advised her to use a cane or a walker. (Tr. 63, 75-76.) Her leg pain and numbness cause her to have difficulty walking; going up or down steps; and, getting in and out of a chair, bed, or bathtub. (Tr. 62-63, 68, 74-75.)

- She had knee surgery in September 2011 but "it didn't take effect to help me get up and down steps." (Tr. 62.) She had a "fusion surgery" in February 2012 "where he had to cut the bone and . . . fuse a rod onto my bone in my right leg for me to be able to try to get up and down steps." (Tr. 62-63.) Her orthopedic surgeon, Dr. Guth, advised her to walk with a cane or walker. (Tr. 65, 77.)

- She also experiences a "pinching feeling" in her lower back. (Tr. 80.) She does not think she would be able to sit on a stool for any prolonged period of time. *Id.*

- She only takes over-the-counter pain medications because she cannot tolerate the side effects from prescription pain medication. (Tr. 67.) Her side effects include "throw[ing] up constantly" and feeling "deathly ill." (Tr. 64, 74.) She threw up two to three times per day when taking Gabapentin, Lyrica, Vicodin, Percocet, and Savella. (Tr. 74.)

- She can sit or stand for up to one hour each before having to change positions due to pain. (Tr. 67-68.) She used to be able to walk five miles per day, but now she "can't even walk to the car without being out of breath and without my legs starting to go numb." (Tr. 68.) The heaviest weight she can lift and carry is five pounds. *Id.* If she attempts to lift or carry anything heavier than that, she will drop it. *Id.*

- She also visits her "breathing doctor" once a month for asthma. (Tr. 66.) She takes Symbicort, Spiriva, and a ProAir inhaler for her breathing issues. (Tr. 64.) She quit smoking in October 2011. (Tr. 66.)

- On a typical day, she sits for about 15 to 20 minutes and then gets up and walks around for a little bit before laying down in bed. (Tr. 70-71.) She watches television for about three hours per day, and plays on the computer "every now and then." (Tr. 71, 78.) She does not attend church or go out to the movies or to restaurants. (Tr. 70.) She goes to her mother's house about twice per month to visit. (Tr. 70.) She has a driver's license, but does not drive long distances. (Tr. 57.) She goes with her husband to the grocery store but sits in an electric cart. (Tr. 69.) She does "absolutely nothing" with regard to household chores. *Id*. She used to enjoy fishing, camping and playing Bingo, but can no longer participate in these activities due to her pain. (Tr. 70.)

The VE testified Turner had past relevant work as a waitress (semi-skilled; medium as performed); short order cook (semi-skilled, medium as performed); self-employed caregiver (semi-skilled, heavy as performed); packer (unskilled, light); construction worker (unskilled, heavy as performed); and, cashier (unskilled, medium as performed). (Tr. 83-84.) The ALJ then posed the following hypothetical question:

> * * * For the first hypothetical, let's assume a hypothetical individual of the claimant's age and education with the past jobs that you've just described. Further assume that this individual is limited to light work, which we shall define as: the ability to lift and/or carry 20 pounds occasionally and ten pounds frequently; the ability to sit, stand and/or walk for six hours in an eight hour work day; no limitations on the ability to push and/or pull within the weight limits for lifting and carrying – one second. The individual is limited to frequent handling, with the right extremity, the right hand. The individual is limited to frequent climbing of ramps and stairs, no climbing of ladders, ropes and scaffolds; occasional balance, stoop, kneel, crouch and crawl. The individual– one second, should avoid concentrated exposure to fumes, odors, dust, gasses, poor ventilation, etc. Within those parameters, would the individual be able to perform any of the past work that you just defined?

(Tr. 84-85.) The VE testified the individual would be able to perform the cashier, waitress, packer, and short order cook jobs, but at the light level rather than the medium level as performed by Turner. (Tr. 85.) The VE further testified the individual could also perform other jobs in the national economy, such as laundry aide (unskilled, light); storage facility rental clerk (unskilled, light); and, warehouse checker (unskilled, light). (Tr. 85-86.)

The ALJ then posed a second hypothetical that was the same as the first but with the following changes: ". . . the individual is limited to occasional climbing of ramps and stairs. Never climb ladders, ropes or scaffolds. All other posturals will be occasional. And then, with handling, with the right hand, we'll still limit the individual to frequent handling on the right. And let's limit the fingering on the right to frequent as well." (Tr. 86.) The VE testified that the previously identified jobs would still be available. (Tr. 86-87.) The ALJ then added the limitation that a cane or walker would be needed for ambulation. (Tr. 88.) The VE testified the storage facility rental clerk "possibly would remain," but not the other jobs. *Id*.

The ALJ then posed a third hypothetical, that changed the exertional level to sedentary with the same postural, manipulative, and environmental limitations as the second hypothetical. (Tr. 88-89.) The VE testified the individual would not be able to perform any of Turner's past relevant work but would be able to perform the jobs of telephone information clerk (unskilled, sedentary); charge account clerk (unskilled, sedentary); and, food and beverage order clerk (unskilled, sedentary). (Tr. 89.) The VE also testified that these jobs would still be available if

the individual required a cane or walker for ambulation.[3] (Tr. 89-90.)

Finally, the ALJ posed the following hypothetical:

> And for my last hypothetical, we're limiting the individual again to sedentary work. However, we will add to that that the individual can lift and/or carry a maximum of five pounds. And one second. And then also, that the individual has to alternate between sitting and standing every half hour. Manipulative limitations, the individual is limited to occasional handling with the right and left hands as well as occasional fingering with the right and left hands. The same environmental limitations as discussed earlier. And, posturally, the individual would be limited to occasional climbing of ramps and stairs, no climbing of ladders, ropes, or scaffolds. All other posturals would be occasional. Within those parameters, would there be work in the national economy?

(Tr. 90.) The VE testified there would not be any work for such an individual. *Id.*

Turner's attorney then asked the VE the following: "if you were to consider a person who was unable to lift or carry anything greater than five pounds; needs a cane for ambulation; falls one to two times a month; requires time missed from the job for doctors' appointments three times a month; has very limited handling and fingering; can sit and stand only in half an hour increments, — would there be any past relevant work available?" (Tr. 94-95.) The VE testified the individual would not be able to perform Turner's past relevant work and, further, that there would be no jobs available for such an individual. (Tr. 94-95.) Upon additional questioning, the VE specifically clarified there would be no work available for a person limited to unskilled labor who would need to miss work three times a month for doctors' appointments, or was limited to lifting and carrying five pounds. (Tr. 95-96.)

## III. Standard for Disability

A disabled claimant may be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and

[3] Turner's attorney questioned the VE regarding whether the individual could truly perform the telephone information clerk, charge account clerk, and food/beverage order clerk jobs while requiring a walker for ambulation. (Tr. 93-94.) The VE acknowledged that needing a walker would interfere with the performance of these jobs. (Tr. 94.) Upon questioning by the ALJ, the VE later clarified that the use of a cane for ambulation would not affect the availability of these three jobs. (Tr. 96-97.)

416.1201. The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity." Second, the claimant must suffer from a "severe impairment." A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

**IV. Summary of Commissioner's Decision**

The ALJ found Turner established medically determinable, severe impairments, due to fibromyalgia, COPD, status-post tibial tubercle transfer of the right knee, and obesity; however, her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 21-23.) Turner was found incapable of performing her past work activities, but was determined to have a Residual Functional Capacity ("RFC") for a limited range of sedentary work. (Tr. 24-28.) The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Turner was not disabled. (Tr. 28-30.)

**V. Standard of Review**

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been

defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v.*

*Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. Analysis

Turner claims the ALJ erred by (1) failing to acknowledge her diagnosis of meralgia paresthetica;[4] (2) improperly evaluating her fibromyalgia; (3) failing to give "good reasons" for rejecting Dr. Perryman's opinion; and, (4) improperly evaluating her credibility. (Doc. No. 21.) The Commissioner argues the ALJ's decision is supported by substantial evidence. (Doc. No. 22.)

***Treating Physician/Fibromyalgia***

Turner argues the ALJ failed to provide good reasons for rejecting Dr. Perryman's April 2012 opinion. She disputes the ALJ's conclusion that Dr. Perryman's opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques, arguing the "record is full of clinical support for fibromyalgia pain, lumbar pain, left leg pain and numbness, and hand cramping." (Doc. No. 21 at 21.) In addition, Turner maintains the ALJ's conclusion that Dr. Perryman's opinion was not supported by her physical examination findings is both vague and inaccurate. Moreover, in a related argument, Turner maintains the ALJ improperly evaluated her fibromyalgia by relying on physical examination findings showing normal strength and range of motion, and a lack of objective medical evidence. *Id.* at 15-16.

The Commissioner argues the ALJ properly found that Dr. Perryman's opinion "departed substantially from the rest of the evidence of record." (Doc. No. 22 at 18.) She notes the ALJ did not focus solely on the objective medical evidence but also considered Turner's longitudinal treatment history, including significant gaps in her treatment with Dr. Perryman. *Id.* at 15. Lastly, the Commissioner argues the ALJ correctly found Dr. Perryman's opinion was inconsistent with her treatment notes, noting Dr. Perryman "usually provided treatment to

---

[4] Meralgia paresthetica is "a type of entrapment neuropathy caused by entrapment of the lateral femoral cutaneous nerve at the inguinal ligament, causing paresthesia, pain, and numbness in the outer surface of the thigh in the region supplied by the nerve." Dorland's Illustrated Medical Dictionary (2003, 30th ed.)

Plaintiff for matters tangentially related (e.g. vitamin B12 injections) or unrelated (e.g. cough or shortness of breath) to her fibromyalgia." *Id*. at 20.

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2). "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[5]

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers*, 486 F.3d at 242 (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5). The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some

[5] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id.* It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

As discussed above, Dr. Perryman had been Turner's primary care physician for approximately four years when she offered her April 2012 opinion. Indeed, the record reflects Turner presented to Dr. Perryman on at least eighteen (18) occasions between August 2008 and April 2012, often with complaints of hand cramping, leg numbness/tingling, and pain in her back, legs, and knees. (Tr. 376, 375, 374, 365, 363, 884, 882, 881, 927.) Among other things, Dr. Perryman's treatment notes indicate she assessed Turner as suffering from fibromyalgia.

(Tr. 368, 365, 364, 927.) Fibromyalgia "is a medical condition marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'" *Rogers*, 486 F.3d at 244, n. 3 (*quoting* Stedman's Medical Dictionary for the Health Professions and Nursing at 541 (5th ed. 2005)). Diagnosing fibromyalgia involves "observation of the characteristic tenderness in certain focal points, recognition of hallmark symptoms, and 'systematic' elimination of other diagnoses." *Id.* (*quoting Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988). CT scans, x-rays, and minor abnormalities "are not highly relevant in diagnosing [fibromyalgia] or its severity." *Id.*; *see also Preston*, 854 F.2d at 820. "[P]hysical examinations will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion." *Preston,* 854 F.2d at 818. *See also Rogers*, 486 F.3d at 244. As one court explained:

> Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and--the only symptom that discriminates between it and other diseases of a rheumatic character--multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch. All these symptoms are easy to fake, although few applicants for disability benefits may yet be aware of the specific locations that if palpated will cause the patient who really has fibromyalgia to flinch. There is no serious doubt that [the claimant] is afflicted with the disease but it is difficult to determine the severity of her condition because of the unavailability of objective clinical tests. Some people may have such a severe case of fibromyalgia as to be totally disabled from working, Michael Doherty & Adrian Jones, "Fibromyalgia Syndrome (ABC of Rheumatology)," 310 British Med. J. 386 (1995); *Preston v. Secretary of Health & Human Services*, 854 F.2d 815, 818 (6th Cir. 1988) (*per curiam*), but most do not and the question is whether [claimant] is one of the minority.

*Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir. 1996).

A treating physician's opinion that a claimant is disabled by fibromyalgia may be accorded controlling weight if the physician has treated the claimant's symptoms over a lengthy period of time and excluded other possible diagnoses, and if the finding of disability is not contradicted by other substantial evidence of record. *Boston v. Astrue*, 2011 WL 4914759, *6 (S.D. Ohio Sep. 15, 2011) (*citing Preston*, 854 F.2d at 820). Nonetheless, "'the mere diagnosis

of fibromyalgia is insufficient to render a claimant's complaints of disabling pain credible.'" *Estep v. Astrue*, 2012 WL 195568 at * 11 (N.D. Ohio Jan. 23, 2012) (quoting *Vlaiku v. Astrue*, 2008 U.S. Dist. LEXIS 64442 (N.D. Ohio Aug. 4, 2008)). *See also Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967)("[t]he fact that a person is suffering from a diagnosed disease or ailment is not sufficient in the absence of proof of its disabling severity to warrant the award of benefits").

In the instant case, the ALJ explicitly recognized, at step two, that Turner's fibromyalgia constituted a "severe" impairment. (Tr. 21.) The decision discussed the evidence regarding Turner's fibromyalgia as follows:

> In terms of the claimant's alleged physical impairments, the undersigned finds that the record contains evidence that undermines her allegations of disability. Concerning the claimant's musculoskeletal and fibromyalgia difficulties, in March 2010, an x-ray of the claimant's lumbar spine showed only mild facet arthropathy and minimal degenerative changes at bilateral sacroiliac joints. (Exhibit 6F). An April 2010 x-ray of the claimant's lumbar spine demonstrated only mild to moderate degenerative changes and minimal spurring at the anterior and superior aspect of the L4 level, relative to the claimant's age. (Exhibit 11F). A June 2010 MRI of the claimant's lumbar spine also revealed only very mild disc bulges at the L5-S1 level, and some mild to moderate bilateral foraminal narrowing at the L5-S1 level. (Exhibit 21F).
>
> Moreover, despite the claimant's complaints of low back pain, numbness and tingling in her back and legs, and tenderness consistent with fibromyalgia, musculoskeletal examinations consistently yielded normal findings, as no synovitis in any joints or significant tenderness over the lumbar spine was detected. (Exhibits 6F and 18F). The claimant was also assessed as exhibiting full range of motion in all joints, normal muscle strength and tone in her upper and lower extremities, no edema in the extremities, no joint swelling, normal finger-nose-finger and finger-toe-finger coordination, and a normal gait. (*Id.*) In addition, despite the claimant's complaints of hand cramping, she testified that she is able to operate a computer mouse and write, as well as grasp and manipulate items. (Hearing Testimony.)

(Tr. 25.) After discussing the medical evidence regarding Turner's other severe impairments (i.e. her COPD and status-post knee surgery), the ALJ found Turner's credibility regarding the intensity, persistence, and limiting effects of her symptoms was "deficient" because (1) she had not been "entirely compliant" in taking prescribed medications; (2) she had not taken any narcotic-based pain relieving medications; (3) she had only a sporadic work history; and, (4) she reported the ability to tend to her personal care and grooming, perform household chores, prepare meals, watch television, play games, and socialize with family and friends. (Tr. 25-26.)

After discussing and assigning "great weight" to the opinions of state agency physicians Gary Hinzman, M.D., and Nick Albert, M.D.,[6] the ALJ evaluated Dr. Perryman's opinion as follows:

> Consequently, the undersigned assigns minimal weight to the opinion of the claimant's treating physician, Dr. Brenda Perryman. In April 2012, Dr. Perryman assessed the claimant's physical residual functional capacity. (Exhibit 26F). Because of her assessment, Dr. Perryman concluded that the claimant is significantly limited in a variety of work-related physical and mental activities, thus, rendering her incapable of carrying out the activities in the above residual functioning capacity. *(Id.)* Despite her treating status, Dr. Perryman's opinion is not consistent with the record as a whole.
>
> In order for a treating physician's opinion to be given controlling weight, it must be well supported by medically acceptable clinical and laboratory diagnostic techniques. See, Social Security Ruling 96-2p. Dr. Perryman's opinion is not well supported by medically acceptable clinical and diagnostic techniques. As discussed above, physical examination notes taken by Dr. Perryman fail to support the notion that the claimant is limited to the extent that she now suggests. (Exhibits 12F and 24F). Specifically, upon examination, a review of the claimant's lungs, heart, extremities, and neurological system yielded normal findings. (Exhibit 24F). Moreover, the claimant cancelled an appointment with Dr. Perryman, and the record reflects significant gaps in the claimant's history of treatment by Dr. Perryman. (Exhibit 12F and 24F).
>
> Thus, Dr. Perryman's physical residual functional capacity assessment fails to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact disabled and the doctor did not specifically address this weakness. The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality that should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from

---

[6] On November 1, 2010, Dr. Hinzman reviewed Turner's medical records and completed a Physical RFC Assessment. (Tr. 108-110.) He opined Turner was capable of lifting and carrying 20 pounds occasionally and 10 pounds frequently; sitting for a total of about 6 hours in an 8 hour work day; standing and/or walking for a total of 6 hours in an 8 hour workday; unlimited push/pull capacity; occasionally climbing ramps, stairs, ladders, ropes, and scaffolds; and, occasionally balancing, stooping, kneeling, crouching and crawling. (Tr. 108-109.) He also offered that Turner had no manipulative limitations. (Tr. 109.) Subsequently, on March 27, 2011, Dr. Albert reviewed Turner's records and similarly opined she was capable of lifting and carrying 20 pounds occasionally and 10 pounds frequently; sitting for a total of about 6 hours in an 8 hour work day; standing and/or walking for a total of 6 hours in an 8 hour workday; and, unlimited push/pull capacity. (Tr. 122.) He further concluded Turner could frequently climb ramps and stairs; never climb ladders, ropes or scaffolds; and, occasionally balance, stoop, kneel, crouch, and crawl. (Tr. 122-123.) Finally, he offered that Turner was unlimited in her ability to reach in any direction (including overhead); unlimited with respect to fine manipulation; and, limited in her ability to engage in gross manipulation with her right hand. (Tr. 123.)

> their physicians, who might provide such a note in order to satisfy these requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case. Thus, the undersigned finds Dr. Perryman's opinion is unpersuasive, and merits minimal weight.

(Tr. 27-28.) The ALJ formulated the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) such that the claimant can lift and carry 10 pounds occasionally, sit for a total of 6 hours in an 8-hour workday, with normal breaks, stand and walk for a total of 2 hours in an 8 hour workday, with normal breaks, and push and pull within these limitations. The claimant can occasionally climb ramps and stairs, but never ladders, ropes or scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. The claimant can frequently handle and finger with the right hand. In addition, she must avoid concentrated exposure to fumes, odors, dusts, gases, or poor ventilation, etc.

(Tr. 24.)

Comparing Dr. Perryman's April 2012 opinion with the above RFC, it is clear the ALJ rejected virtually all of the limitations assessed. Specifically, the ALJ clearly rejected Dr. Perryman's opinions that Turner could (1) never lift and carry more than 10 pounds and only rarely lift and carry less than 10 pounds; and, (2) sit for a total of less than two hours in an 8 hour work day. (Tr. 923-924.) The decision also rejected Dr. Perryman's opinion that Turner would need a job that permitted shifting at will from sitting, standing, or walking; and, frequent unscheduled breaks of 30 minutes in duration. *Id.* The ALJ also appears to have rejected Dr. Perryman's conclusion that Turner would need to elevate her legs at a 90 degree angle for 50% of the workday, as well as her opinions regarding Turner's fine manipulation and reaching limitations. (Tr. 924-925.) The ALJ's rejection of Dr. Perryman's opinions is significant because the VE specifically testified there would be no work available for a person limited to sedentary work who could lift and/or carry a maximum of five pounds; would need to alternate between sitting and standing every half hour; and, would be limited to occasional bilateral handling and fingering. (Tr. 90.)

The Court finds the ALJ failed to provide "good reasons" for rejecting Dr. Perryman's opinions. The ALJ's first basis for doing so (i.e., that Dr. Perryman's opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques) appears to be

based on the lack of objective medical evidence and physical examination findings supporting Turner's allegations of disabling musculoskeletal pain as a result of her fibromyalgia. It is clear, however, that the lack of "objective" medical evidence is not unusual, but rather the norm in fibromyalgia cases. *See Rogers*, 486 F.3d at 244 (noting that CT scans, x-rays, and minor abnormalities "are not highly relevant in diagnosing [fibromyalgia] or its severity"); *Preston*, 854 F.2d at 817-818 (stating that "[t]here are no objective tests which can conclusively confirm" fibromyalgia); *Keating v. Comm'r of Soc. Sec.*, 2014 WL 1238611 at * 6 (N.D. Ohio March 25, 2014) ("This circuit has recognized that symptoms of fibromyalgia are often not supportable by objective medical evidence"); *Schlote v. Astrue*, 2012 WL 1965765 at * 6 (N.D. Ohio May 31, 2012). Similarly, the fact that Dr. Perryman's physical examinations of Turner's extremities and neurological systems "yielded normal findings" is not necessarily inconsistent with fibromyalgia. Indeed, the Sixth Circuit has repeatedly and consistently recognized that fibromyalgia patients typically "manifest normal muscle strength and neurological reactions and have a full range of motion." *Kalmbach v. Comm'r of Soc. Sec.*, 409 Fed. Appx. 852, 861-862 (6th Cir. 2011) (citing *Preston*, 854 F.2d at 820). *See also Minor v. Comm'r of Soc. Sec.*, 513 Fed. Appx. 417, 434 (6th Cir. 2013) (noting fibromyalgia claimants "demonstrate normal muscle strength and neurological reactions and can have a full range of motion"); *Keating*, 2014 WL 1238611 at * 6.

Rather, and "[i]n the absence of other objectively ascertainable manifestations, the process of diagnosing fibromyalgia includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials." *Kalmbach*, 409 Fed. Appx. at 861. *See also Minor*, 513 Fed. Appx. at 434; *Preston*, 854 F.2d at 820; *Swain v. Comm'r of Soc. Sec.*, 297 F.Supp.2d 986, 990 (N.D. Ohio 2003). Here, Turner was diagnosed with fibromyalgia by her primary care physician, Dr. Perryman; rheumatologists Dr. Zhang and Dr. Mehta; and by neurologist Dr. Pritula. (Tr. 368, 384, 387, 390, 732.) There are repeated references in treatment notes throughout the record indicating Turner exhibited "excessive" (i.e. 18/18) tender points, which were variously described as "consistent with fibromyalgia" or "in fibromyalgia distribution." (Tr. 384, 386,

390, 732.) However, the ALJ fails to make any mention of this evidence, focusing entirely on x-ray and MRI results showing mild degenerative changes and "normal" neurological examination results. As this Court has noted on previous occasions, "[it] is incumbent upon the ALJ to apply the correct standard under existing Sixth Circuit precedent" when evaluating fibromyalgia claims. *Schlote*, 2012 WL 1965765 at * 6. By focusing entirely on the lack of objective medical evidence and neurological examinations showing full strength and range of motion (and ignoring tender point test results directly relevant to this condition), the ALJ failed to properly evaluate Turner's fibromyalgia. Moreover, because Dr. Perryman's April 2012 opinion was based (at least in part) on Turner's complaints of severe pain stemming from fibromyalgia, the Court finds the lack of objective medical evidence and normal examination findings do not constitute a "good reason" for rejecting Dr. Perryman's opinion.

The Court further finds the other reasons provided by the ALJ for rejecting Dr. Perryman's opinion do not constitute "good reasons" under the circumstances presented. The ALJ notes Turner cancelled an appointment with Dr. Perryman and states that the record reflects "significant gaps" in her history of treatment by Dr. Perryman. (Tr. 28.) The fact that Turner missed one appointment, however, is not a "good reason" for rejecting Dr. Perryman's opinion given that Turner presented to Dr. Perryman over a lengthy period of time and, in fact, saw her on at least 18 occasions between August 2008 and April 2012. Moreover, while the ALJ correctly notes Turner apparently did not visit Dr. Perryman between April 2010 and August 2011, the record reflects that, during this time period, Turner did not forego all medical treatment but, rather, had numerous appointments with Drs. Zhang, Mehta, Crowell, Pritula, and Kumpf. (Tr. 562, 573, 392, 732-733, 724, 720, 772-777.) Moreover, Dr. Perrryman personally examined Turner on five occasions between August 2011 and her April 23, 2012 opinion. Turner frequently presented with complaints of chronic musculoskeletal pain. (Tr. 884, 883, 882, 881, 927.)

Finally, the ALJ appears to have based her rejection of Dr. Perryman's opinion, at least in part, on the grounds that it may have been an accommodation based on sympathy or "insistent and demanding" requests for support. (Tr. 28.) As an initial matter, the Court notes the Sixth

Circuit has rejected the use of nearly identical language to dismiss a treating physician opinion where an ALJ fails to otherwise sufficiently articulate good reasons. *See Blakley*, 581 F.3d at 408. Moreover, here, the ALJ appears to have concluded Dr. Perryman's opinion was an accommodation because it "departs substantially from the rest of the evidence of record." (Tr. 28.) The Courts finds this reason unpersuasive, however, given the ALJ's failure to properly analyze Turner's fibromyalgia or otherwise acknowledge the record evidence regarding her tender points and consistent complaints of severe body pain to numerous physicians, including Dr. Perryman.

Accordingly, and for the reasons set forth above, the Court finds the ALJ failed to provide "good reasons" for according "minimal weight" to Dr. Perryman's April 2012 opinion. The Court, therefore, recommends this matter be remanded to afford the ALJ an opportunity to sufficiently evaluate the limitations assessed by Dr. Perryman as a result of Turner's musculoskeletal pain and fibromyalgia. As the Court is recommending a remand for further proceedings, and in the interests of judicial economy, the Court will not consider Turner's remaining assignments of error.

## VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner not supported by substantial evidence. Accordingly, the decision should be VACATED and the case REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation.

s/ Greg White
United States Magistrate Judge

Date: August 7, 2014

**OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir.**

**1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985)*, reh'g denied*, 474 U.S. 1111 (1986).**